UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

AI RENEE GANT                                    CIVIL ACTION NO. 6:15-cv-01962

VERSUS                                           JUDGE WALTER

U.S. COMMISSIONER,                               MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be AFFIRMED.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Ai Renee Gant,[1] fully exhausted her administrative remedies

prior to filing this action in federal court.  The claimant filed an application for

supplemental security income benefits ("SSI"), alleging disability beginning on

January 1, 2009.[2]  Her application was denied.[3]  The claimant requested a hearing,

which was held on December 20, 2013 before Administrative Law Judge Steven L.

---

[1]      The claimant's name is spelled variously throughout the record.  Indeed, the claimant signs her name "Ai Rene Gant."

[2]      Rec. Doc. 7-1 at 112.

[3]      Rec. Doc. 7-1 at 79.

Cravens.[4]  The ALJ issued a decision on March 5, 2014,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from January 16, 2013 through the date of the decision.  The claimant asked for review of the decision, but the Appeals Council concluded on April 27, 2015 that no basis existed for review of the ALJ's decision.[6]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on August 19, 1980.[7]  At the time of the ALJ's decision, she was thirty-three years old.  She was in special education classes in the third grade, and she dropped out of school in the ninth grade.[8]  There is no evidence that she had any further formal education or vocational training.  She has past relevant work experience as a custodian for the Lafayette Parish School System, a housekeeper for a hospital, a dietary employee at a nursing home, a cafeteria-style line server at a

---

[4]    The hearing transcript is found at Rec. Doc. 7-1 at 28-66.

[5]    Rec. Doc. 7-1 at 12-22.

[6]    Rec. Doc. 7-1 at 4.

[7]    Rec. Doc. 7-1 at 32, 112.

[8]    Rec. Doc. 7-1 at 35.

seafood restaurant, a cook in a pizza restaurant, and a preparer of newspapers to be sold in vending machines.[9]  In a disability report prepared along with her application for benefits, the claimant alleged that she had been disabled since 2009[10] due to depression, irritable bowel syndrome, and paranoia.[11]  In support of her appeal, she described her allegedly disabling conditions as abdominal lesions, chronic gastrointestinal problems, depression, and paranoia.[12]

The evidence in the record establishes that the claimant has been treated for both mental health issues and gastrointestinal problems.

On March 7, 2012, diagnostic imaging conducted at Abbeville General Hospital in Abbeville, Louisiana, indicated that the claimant had a 6 cm retrocardiac hiatal hernia.[13]

---

[9]     Rec. Doc. 7-1 at 35-40, 145.

[10]     Her application for SSI benefits alleges a disability onset date of January 1, 2009 (Rec. Doc. 7-1 at 112), but she argues in this appeal that she has been disabled since November 1, 2009 (Rec. Doc. 12 at 1).  The ALJ found that she had not been disabled since January 16, 2013, the date on which she filed her application for benefits.

[11]     Rec. Doc. 7-1 at 154.

[12]     Rec. Doc. 12 at 1.

[13]     Rec. Doc. 7-1 at 294.  According to the Mayo Clinic, "A hiatal hernia occurs when part of your stomach pushes upward through your diaphragm."   The Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/hiatal-hernia/basics/definition/con-20030640 (last visited June 27, 2106).

On March 8, 2012,[14] the claimant underwent laparoscopic surgery, performed by Dr. Weston Miller at Abbeville General Hospital, during which her gall bladder was removed and extensive lysis of adhesions was performed.  Prior to surgery, the claimant had been diagnosed with an incarcerated hiatal hernia.  During surgery, she was found to have chronic inflammation of the gall bladder as well as dense adhesions of the small bowel.  The operative report indicates that the small bowel had adhered to the anterior abdominal wall, to the entire pelvis anterolaterally, and posteriorly to the sigmoid colon, and to the sigmoid mesocolon.

On April 4, 2012,[15] the claimant was seen by her primary health care provider, the SWLA Center for Health Services in Lafayette, Louisiana, with complaints of gas, constipation, and bloating.  She was instructed to make changes to her diet.

On May 8, 2012,[16] she was again seen at SWLA Center for complaints of constipation and a swollen, hard abdomen.  She reported that she had been doing well until she went to a festival, drank too much, and took some cocaine.  She was advised to take over the counter medications for her constipation.  She was also treated for an eyelid infection.

---

[14]     Rec. Doc. 7-1 at 289-291.

[15]     Rec. Doc. 7-1 at 214-217.

[16]     Rec. Doc. 7-1 at 218-220.

On June 5, 2012,[17] the claimant returned to the SWLA Center, complaining about lower abdominal pain and a burning sensation in her stomach.  She was prescribed Bactrim and Contulose.

On June 19, 2012,[18] the claimant returned to the SWLA Center, again complaining about constipation, gas, and abdominal pain.  She was prescribed Prilosec and Colace.

On June 28, 2012, a CT of the abdomen and pelvis showed a moderate hiatal hernia.[19]

On July 3, 2012,[20] the claimant returned to the SWLA Center.  She complained of constant abdominal pain that she described as 10/10, gas, and nausea.  She was again prescribed Bactrim, and Tramadol was prescribed for pain.

On July 19, 2012,[21] the claimant was seen at SWLA Center for complaints of constant upper abdominal pain.  She described the pain as sharp and rated it as 8/10. She requested a referral to the surgeon who removed her gall bladder, suggesting that she needed to have her hiatal hernia surgically repaired.

---

[17]     Rec. Doc. 7-1 at 221-228.

[18]     Rec. Doc. 7-1 at 229-237.

[19]     Rec. Doc. 7-1 at 249-250.

[20]     Rec. Doc. 7-1 at 239-244.

[21]     Rec. Doc. 7-1 at 246-248.

On August 7, 2012,[22] the claimant was examined by Dr. Keith A. Colomb, on referral from SWLA Center.  Her abdomen was soft and non-tender.  Dr. Colomb diagnosed hiatal hernia without reflux.  He counseled the claimant regarding diet and exercise.  He advised that she continue taking Prilosec, and he recommended that she be referred back to her primary care physician for esophagogastroduodenoscopy ("EGD"), an examination of the upper gastrointestinal tract.

The very next day, the claimant was again seen at SWLA Center.[23]  She claimed that she had been to Lafayette General Medical Center, where she was allegedly told that she had a toothache and given Amoxil and Lortab.  She complained that she was unable to sleep, hears whispers and sees shadows, always feels paranoid, and wakes up thinking someone is breaking into her house.  She stated that these symptoms began ten years previously and worsened over time.  She also stated that Dr. Colomb told her that a hiatal hernia should not cause the pain she experiences.  She complained of a throbbing headache, rating the pain as 7/10.  The impressions were depression and hallucinations.  She was prescribed hydrocodone-acetaminophen.

---

[22]     Rec. Doc. 7-1 at 274-276.

[23]     Rec. Doc. 7-1 at 251-257.

-6-

The claimant returned to SWLA Center on August 21, 2012.[24] She complained of an achy abdomen, rating the pain 7/10.  Her abdomen was distended but soft, and she complained about burping a lot and stated that she is lactose intolerant.  She was given an appointment with Dr. Alvarez for EGD.

The claimant first saw Dr. Luis E. Alvarez, a gastroenterologist, on September 6, 2012.[25]  Her chief complaints were nausea, gas, and bloating.  She also complained of constipation, rectal pain, lower abdominal pain, and stomach swelling.  A colonoscopy on September 11, 2012 was normal.[26]  The EGD procedure was performed on September 18, 2012, and it showed a hiatus[27] hernia in the esophagus, a stricture in the distal third of the esophagus, esophagitis in the distal third of the esophagus, gastritis in the antrum and on the greater curvature of the stomach body, and a normal duodenum.[28]  She was advised to stop taking Prilosec, was advised to make relevant dietary changes, and was prescribed Dexilant.

---

[24]     Rec. Doc. 7-1 at 255-257.

[25]     Rec. Doc. 7-1 at 331-340.

[26]     Rec. Doc. 7-1 at 354.

[27]     Spelled this way in the report.

[28]     Rec. Doc. 7-1 at 273.

-7-

On September 26, 2012, the claimant began treating with a psychiatrist, Dr. Susan E. Uhrich.[29]  Her chief complaint was paranoia.  She also described a history of cocaine, alcohol, and Xanax abuse.  She claimed to be depressed due to pain from a hiatal hernia.  She reported seeing black things climbing on the wall, feeling things crawling on her body, and hearing voices.  She told Dr. Uhrich that she was then taking no medications.  Dr. Uhrich diagnosed the claimant with Major Depression R/S with Psychosis.  She prescribed Cymbalta, Seroquel, and Remeron.  The claimant was to follow up in a month.

On September 27, 2012, the claimant returned to Dr. Alvarez.[30]  She continued to complain of abdominal pain.  Her medications were adjusted.

On October 10, 2012,[31] the claimant phoned Dr. Uhrich's office and reported that she had not begun taking any of the medications prescribed by Dr. Uhrich because she was afraid they would cause constipation.  Dr. Uhrich substituted Luvox for the medications originally prescribed.

---

[29]     Rec. Doc. 7-1 at 205-212.

[30]     Rec. Doc. 7-1 at 328.

[31]     Rec. Doc. 7-1 at 211.

On October 12, 2012,[32] the claimant was seen at SWLA Center, complaining of vaginal pressure and bladder incontinence as well as pelvic pain that had allegedly persisted for seven months.  The impressions were mixed incontinence urge and stress, chronic pelvic pain, abdominal pain, and abdominal bloating.  She was prescribed Colace, Metronidazole, Detrol, Promethazine, Flexeril, Azithromycin, and Prilosec.

On November 2, 2012,[33] the claimant was again seen at SWLA Center.  Her chief compliant was bladder discomfort, but she also complained about abdominal bloating, gas, and pain.  She rated her pain at 7/10.  Lab work done at her prior visit was normal.  She was diagnosed with chronic pelvic pain, abdominal pain, and mixed incontinence urge and stress.  The Flexeril was discontinued.  She was given Bentyl for abdominal pain and Detrol for the pelvic pain.

On November 27, 2012, the claimant underwent surgery for a laparoscopic hiatal hernia repair and lysis of adhesions.[34]  The surgery was performed by Dr. Weston Miller at Abbeville General Hospital, who described a large incarcerated hiatal hernia and dense adhesions of the small bowel to the pelvic sidewall deep into

---

[32]     Rec. Doc. 7-1 at 259-266.

[33]     Rec. Doc. 7-1 at 269-272.

[34]     Rec. Doc. 7-1 at 300-301.

the pelvis, onto the anterior surface of the abdomen and pelvis to include the bladder and vaginal cuff.  The adhesions were causing a small bowel obstruction.

On March 5, 2013,[35] the claimant was seen at LSU University Medical Center in Lafayette, Louisiana, complaining of constant pain since her gall bladder surgery. She rated her pain as 10/10.  She was referred to the internal medicine clinic for evaluation of her history of irritable bowel syndrome.

On May 3, 2013, the claimant was examined by Dr. Julana Monti at the request of Disability Determination Services.[36]  The claimant told Dr. Monti that she began having pain in her abdomen following a hysterectomy in 2009, that she felt better for a few months following hernia repair and removal of adhesions in November 2012, but that she again began having abdominal pain, bloating, and constipation thereafter. She told Dr. Monti that she has so much trouble with her abdomen that she cannot maintain employment.  The claimant reported that she was prescribed Luvox, Seroquel, and Mirtazapine but stopped taking them when she ran out of refills. Although Dr. Monti noted no abdominal distention, the claimant guarded the right lower quadrant of her abdomen.  Dr. Monti noted no restrictions on the claimant's ability to read, drive, or perform fine motor tasks.  In his opinion, the claimant could

---

[35]     Rec. Doc. 7-1 at 308.

[36]     Rec. Doc. 7-1 at 309-312.

sit for eight hours, stand for four hours, and walk for four hours per workday without an assistive device, and lift or carry objects weighing up to fifteen pounds.  He also opined that the claimant can interact effectively and peaceably with others, understand and follow instructions, and communicate without difficulty. He did note, however, that she has a high risk of recurrent adhesions.

On May 12, 2013,[37] the claimant again saw Dr. Uhrich, the psychiatrist.  Her chief complaint was "I don't want to do nothing."  She told Dr. Uhrich that she had recently been going through a lot of stress and was experiencing a lot of abdominal pain.  She indicated that she is paranoid and sometimes sees things crawling on the wall.  Dr. Uhrich prescribed Neurontin and Viibryd.

On May 22, 2013, the claimant was examined by Dr. Alfred E. Buxton, a clinical psychologist, at the request of Disability Determination Services.[38]  She explained to Dr. Buxton that she was single and had a 15 year old daughter who receives treatment for mental health problems.  She was living with her daughter and with her boyfriend of six years.  The relationship with the boyfriend was described as chronically unstable.  The claimant told Dr. Buxton that she dropped out of school in ninth grade and has had no formal education or training since then.  The longest

---

[37]     Rec. Doc. 7-1 at 358-359.

[38]     Rec. Doc. 7-1 at 316-319.

-11-

she ever held a job was for two years.  She told Dr. Buxton that she has acid reflux, chronic lower abdominal pain, and chronic constipation.

She also told Dr. Buxton that she has had chronic mental health issues since the age of fourteen, when she had inpatient treatment.  However, she had not received treatment since October 2012 due to lack of funds.  She previously took psychoactive medications but did not refill her prescriptions after April 2012.  She told Dr. Buxton that there is mental illness on both sides of her family.

The claimant told Dr. Buxton that her sleep, libido, and energy are poor, that she tends to be a loner, that she has chronic social anxiety, but she is able to cook, clean, shop, manage her money, travel, communicate, and manage her time independently.  Her primary hobbies are watching TV and reading.

Dr. Buxton's examination of the claimant revealed good language skills, good social skills, intact recent and remote memories, a good ability to attend and concentrate, and even pace.  The claimant's intellect appeared to be within normal limits, her judgment was good, her reasoning and insight were fair to good, her cognition was clear and cogent, her mood was mildly agitated dysphoria with congruent affect.  Dr. Buxton found no evidence of hallucinatory or delusional phenomena and no suicidal or homicidal/assaultive ideation, intent, or plans.  He noted that the claimant might experience hypervigilance.  She indicated that she is

-12-

chronically mistrustful of others.  The claimant told Dr. Buxton that she is a chronic worrier, that she has episodic frontalis headaches, occasional dizziness associated with increased anxiety, occasional exertional shortness of breath, no blurred vision, no chest pain or tightness, frequent stomach pain, indigestion reduced with medication, frequent dysphoria with crying spells, and only occasional brief happiness.  Dr. Buxton noted that she was alert, responsive, polite, and cooperative.

Dr. Buxton diagnosed Dysthymic Disorder with a mild to moderate degree of impairment and a fair prognosis.  He also diagnosed Personality Disorder, Not Otherwise Specified with Mixed Features.  He advised resumption of outpatient mental health intervention, including counseling and the use of psychoactive medication.  He also advised medical monitoring of her acid reflux and chronic lower abdominal pain.  Dr. Buxton opined that the claimant is bright enough to understand simple and some complex instructions and commands.  In his opinion, she could perform reliably as an employee if she did not have too much contact with other individuals.  He assigned a GAF score of 60 over the last month, 65 over the seven prior months, and 60 for the four months before that.  These scores indicate mild to moderate symptoms.[39]

---

[39]    Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV") at 32.

On June 26, 2013, the claimant returned to SWLA Center, complaining of gas, abdominal cramps, abdominal pain, abdominal bloating, and constipation.  She described the pain as sharp and rated it 8/10.  She also reported that Miralax did not help.  She was prescribed Senokot.

On July 11, 2013, the claimant saw Dr. Uhrich, the psychiatrist.[40]   Her complaints were generally the same except that she stated she was less irritable in the morning.  She told Dr. Uhrich that she stopped taking Buspar and Neurontin because they made her more nauseated, and she refused to try antipsychotic medication due to worrying about constipation.  Her Xanax and Viibryd dosages were increased.

On July 25, 2013, the claimant was again seen by Dr. Alvarez.[41]   She complained of constipation and excessive gas.  She was prescribed Linzess and Lactulose.

On that same day, the claimant filled out a disability report and indicated that she was taking Viibryd for a bipolar condition, Xanax for anxiety, Miralax for constipation, and Lactulose and Linzess for irritable bowel syndrome.[42]

---

[40]      Rec. Doc. 7-1 at 360-361.

[41]      Rec. Doc. 7-1 at 327.

[42]      Rec. Doc. 7-1 at 175.

-14-

On August 9, 2013, the claimant returned to Dr. Uhrich.[43] She reported that she could not take Abilify because it makes her nauseated and sleepy.  She was still seeing things.  Her Xanax and Viibryd prescriptions were increased, and Latuda was prescribed.

On August 20, 2013, abdominal x-rays showed no acute findings but did reveal multiple pelvic phleboliths and right paraspinal vascular calcifications, nonspecific bowel gas pattern with no evidence of ileus or bowel obstruction, and no evidence of fecal colonic distention.[44]

The claimant returned to Dr. Alvarez on August 29, 2013,[45] complaining of a squeezing pain shooting down to the pelvic area.  The next day, she had ultrasound testing of her abdomen, which resulted in no acute findings,[46] and ultrasound testing of her pelvis that was also unremarkable.[47]

The claimant again saw Dr. Uhrich on September 6, 2013.[48]  She seemed less anxious, less angry, and less paranoid.  She was sleeping and eating well.

---

[43]     Rec. Doc. 7-1 at 362-363.

[44]     Rec. Doc. 7-1 at 344.

[45]     Rec. Doc. 7-1 at 326.

[46]     Rec. Doc. 7-1 at 341.

[47]     Rec. Doc. 7-1 at 342.

[48]     Rec. Doc. 7-1 at 364-365.

On October 3, 2013,[49] the claimant again met with Dr. Uhrich.  She reported that she was under a lot of stress because her daughter had been hospitalized.  She was still having auditory hallucinations, but they were decreased.

The claimant again saw Dr. Uhrich on November 4, 2013, reporting that she had a bad week.  She reported improvements in her worrying, denied suicidal and homicidal ideation, denied having visual hallucinations but reported that she was still having auditory hallucinations.

The record contains an undated note[50] "to whom it may concern," that was signed by Danielle J. Threatts, APRN, with Dr. Uhrich's office, stating that the claimant was diagnosed with Shizoaffective Disorder, is often paranoid and anxious, and due to her condition is unable to work.

On December 9, 2013, the claimant listed her medications as:  Vybrid (sic) for bipolar syndrome, Linzess for irritable bowel syndrome, Lactulose for irritable bowel syndrome, Xanax for anxiety, Latuda for schizophrenia, Prilosec for irritable bowel syndrome, and Glycopyrrotate for irritable bowel syndrome.[51]

---

[49]     Rec. Doc. 7-1 at 366-367.

[50]     Rec. Doc. 7-1 at 370.

[51]     Rec. Doc. 7-1 at 202-203.

At the hearing on December 20, 2013, the claimant was asked why she cannot hold a job.  She testified that she takes medication that makes her bowels move with little warning, resulting in soiling accidents.  She also stated that she is always exhausted, and she said that she is in constant pain in her right intestines and pelvic and rectal areas.  She stated that she does not take any medication for the pain because pain medicine causes constipation.  She further stated that she cannot tolerate tight clothes around her waist.  She testified that Dr. Alvarez told her that her physical complaints are related to her nerves.  She attributed her tiredness to her medications. She also complained of memory loss and lack of concentration.  She further complained of being scared, jumpy, and anxious, and stated that she does not like being around people.  On the other hand, the claimant testified that does all of the necessary household chores for she and her daughter, including laundry, dishes, sweeping, taking out the trash, and cooking.  She also handles her personal care and hygiene needs.  She goes to church twice a week and reads the Bible daily.

<u>ANALYSIS</u>

A.   <u>STANDARD OF REVIEW</u>

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[52] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[53] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[54]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[55]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[56] Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the

---

[52]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[53]      *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[54]      *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[55]      42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[56]      *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

courts.[57]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[58]

## B.   ENTITLEMENT TO BENEFITS

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[59]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[60]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but

---

[57]     *Martinez v. Chater*, 64 F.3d at 174.

[58]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[59]     42 U.S.C. § 1382(a)(1) & (2).

[60]     42 U.S.C. § 1382c(a)(3)(A).

-19-

cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[61]

## C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[62]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[63]

---

[61]    42 U.S.C. § 1382c(a)(3)(B).

[62]    20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[63]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[64] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[65]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[66]

The claimant bears the burden of proof on the first four steps.[67]   At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[68]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[69]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[64]     20 C.F.R. § 404.1520(a)(4).

[65]     20 C.F.R. § 404.1545(a)(1).

[66]     20 C.F.R. § 404.1520(e).

[67]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[68]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[69]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[70]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[71]

### D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since January 16, 2013.[72]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  dysthymia, a personality disorder, irritable bowel syndrome, and hernias.[73]  This finding is supported by evidence in the record, and the claimant did not argue that she has any other impairments that the ALJ failed to consider.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[74]  The claimant did not argue that she has any impairment that meets or

---

[70]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[71]   *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[72]   Rec. Doc. 7-1 at 14.

[73]   Rec. Doc. 7-1 at 14.

[74]   Rec. Doc. 7-1 at 15.

equals a listed impairment, nor did she argue that the ALJ failed to properly evaluate the combination of her impairments.

The ALJ found that the claimant has the residual functional capacity to perform light work with certain exceptions.[75]  The claimant disputes this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work.[76]  The claimant did not dispute this finding.

At step five, the ALJ found that the claimant was not disabled from January 16, 2013 through March 5, 2014 (the date of the decision) because there are jobs in the national economy that she can perform.[77]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) in concluding that she can maintain a job by performing work consistently eight hours per day five days per week, and (2) in posing hypothetical questions to the vocational expert at the hearing that did not include all of the claimant's limitations.

---

[75]      Rec. Doc. 7-1 at 16.

[76]      Rec. Doc. 7-1 at 21.

[77]      Rec. Doc. 7-1 at 22.

## G.   THE CLAIMANT'S ABILITY TO WORK CONSISTENTLY

The claimant argues that the frequency of her symptoms and her frequent need for medical attention prevent her from attending work regularly and from staying on task while at work.  Therefore, she argues that the ALJ's residual functional capacity finding is erroneous because it failed to consider whether she could maintain a job once hired due to frequent absences and an inability to stay on task while at work.

There is no requirement that an ALJ make a finding regarding the sustainability of employment in all cases.[78]   Such a finding is necessary only if the claimant's "ailment waxes and wanes in its manifestation of disabling symptoms."[79]  Here, the claimant argued that she is at high risk for more adhesions and, consequently, that her symptoms could easily worsen at any time.[80]   That, however, is not the same as having a condition characterized by symptoms that periodically worsen and then lessen.  Furthermore, this description of the plaintiff's medical condition is wholly speculative.  Although one consultative examiner opined that the claimant is at risk for having more problems with abdominal adhesions in the future, there is at least some degree of probability that she may never develop adhesions again.  The claimant

---

[78]     *Perez v. Barnhart*, 415 F.3d at 465; *Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003).

[79]     *Perez v. Barnhart*, 415 F.3d at 465, quoting *Frank v. Barnhart*, 326 F.3d at 619.

[80]     Rec. Doc. 12 at 7.

does not argue that abdominal adhesions – standing alone – are disabling. Additionally, her past adhesions were surgically treated.  A condition that can reasonably be remedied by medication or surgical intervention generally is not disabling.[81]  In summary, there is no evidence in the record that the claimant's impairments wax and wane such that a separate sustainability finding is necessary. Consequently, there was no requirement that the ALJ's ruling include a separate finding concerning the sustainability of employment.

The Fifth Circuit has held that if an individual's medical treatment interrupts her ability to perform a normal, eight hour workday, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity.[82]  In this case, it is true that the claimant sought treatment for her gastrointestinal problems frequently before her surgery in November 2012, However, there was a marked decrease in the number and frequency of medical appointments thereafter.  The claimant did see her psychiatrist once a month from September 2012 forward, but there is no evidence that she would need to miss an entire day from work each month in order to maintain the frequency of that professional relationship.  Thus,

---

[81]     *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

[82]     *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000), citing *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980).

there is no factual basis for the claimant's argument that she would be unable to sustain employment due to a large number of medical appointments.

The claimant also argued that the side effects of the medications she takes for her conditions cause her to be inattentive or off-task for some portion of each day. The claimant testified at the hearing that her medications cause her to have soiling accidents, but as noted by the ALJ in his ruling, there is no evidence in the record establishing that she ever complained of this side effect to any of her doctors. This contention is also at odds with her frequent complaints of constipation and her reluctance to take certain medications for fear that they would cause or worsen constipation.

The claimant complained that a side effect of the medications she takes for her mental conditions is tiredness. She testified at the hearing that her medications make her tired and, more specifically, that Xanax makes her drowsy and limits the time periods during which she can drive. She also testified that she has memory loss and trouble paying attention. There is no evidence in the record that she ever discussed these alleged side effects with her physicians. She did, however, refuse to take certain medications because she feared they would worsen her constipation. She also told Dr. Uhrich that Abilify made her sleepy, and that medication was discontinued. Similarly, she reported to Dr. Uhrich that she stopped taking Buspar and Neurontin

because they made her more nauseated.  Subsequent treatment notes indicate that she was tolerating her medications well.  It appears that if she were actually having significant side effects from her medications, she would have raised her concern with her doctors, and her doctors would have noted this issue in their treatment notes.  But there is no indication in the record that the claimant told Dr. Uhrich – or any other prescribing doctor – that sleepiness, drowsiness, memory loss, and a failure to pay attention were resulting from prescribed medications.  Further, when the claimant was examined by Dr. Buxton, he found that she had good social skills, an even pace, and a good ability to concentrate and attend.  He also found that her memory was intact. Thus, there is substantial evidence in the record to support the ALJ's credibility determinations and his finding regarding the claimant's residual functional capacity.

In cases like this one, in which there are no impairments characterized by waxing and waning symptoms, "the claimant's ability to maintain employment is subsumed in the RFC [residual functional capacity] determination."[83] "A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold

---

[83]     *Perez v. Barnhart*, 415 F.3d at 465.

whatever job he finds for a significant period of time."[84]  "[T]he ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find and hold a job in the real world."[85]  This requirement extends to cases involving mental as well as physical impairments.[86]  Therefore, the ALJ's finding that the claimant has the residual functional capacity to perform light work with the exceptions noted in the ruling must be understood as implicitly incorporating a finding that she is capable of sustaining employment in such a job.  Because the ALJ applied the proper legal standard and because his residual functional capacity finding is supported by substantial evidence in the record, the ALJ did not err in failing to address whether the claimant can sustain employment or in implicitly finding that the claimant can sustain employment.

## H.    THE HYPOTHETICAL QUESTIONS POSED TO THE VOCATIONAL EXPERT

An ALJ's hypothetical questions to a vocational expert must reasonably incorporate all of the impairments or limitations supported by the evidence in the record and recognized by the ALJ.[87]  If an ALJ's hypothetical fails to incorporate all

---

[84]    *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986) (emphasis in original).

[85]    *Singletary v. Bowen*, 798 F.2d at 822 (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984)).

[86]    *Watson v. Barnhart*, 288 F.3d 212, 217–18 (5th Cir. 2002).

[87]    See *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002).

-28-

of the claimant's functional limitations, the ALJ's determination is not supported by substantial evidence.[88]  The claimant or his representative must also be afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions, including additional disabilities not recognized by the ALJ's findings and disabilities recognized by the ALJ but omitted from the question.[89]  Still, procedural perfection is not required, and a judgment will not be vacated unless the substantial rights of a party are affected.[90]

The claimant argues that the ALJ's finding at step five is flawed because the ALJ posed inaccurate hypothetical questions to the vocational expert at the hearing. More particularly, the claimant criticized the hypothetical questions for not mentioning that the claimant would have to miss at least half a day of work per month for medical treatment and would need unscheduled breaks during the day due to pain. There is no evidence in the record establishing that the claimant would be required to miss work for medical appointments with the frequency suggested by the claimant, nor is there evidence in the record substantiating the claimant's contention that

---

[88]    *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

[89]    *Bowling v. Shalala*, 36 F.3d at 436.

[90]    *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

missing half a day of work per month in order to see a physician would result in termination of employment by every potential employer.  Furthermore, as discussed in the preceding section of this ruling, there is no evidence in the record establishing that the claimant's alleged pain would require her to be off-task for some significant part of every workday.  Consultative examiner Dr. Julana Monti evaluated the claimant on May 3, 2013 and found that the claimant is capable of sitting for eight hours, standing for four hours, and walking for four hours per workday.  He also found her capable of lifting or carrying objects weighing up to fifteen pounds.  He found no restrictions on her ability to read, drive, or perform fine motor tasks.  He found that she is able to interact effectively and peaceably with others, understand and follow instructions, and communicate without difficulty.  Dr. Monti noted his concern that the claimant might develop further abdominal adhesions in the future, but he did not find that she would have to miss work every month for medical treatment nor did he find that she would require unscheduled breaks during the workday.  Dr. Buxton also opined that the claimant was capable of employment so long as her contact with others was restricted.  His analysis did not find that she would require unscheduled breaks or frequent absences.  Dr. Uhrich's office issued a "to whom it may concern" letter stating that the claimant cannot work due to a schizoaffective disorder.  But that letter did not explain why her disorder precludes

her from employment, did not mention frequent medical appointments as a reason why the claimant cannot work, and did not indicate that the claimant would require unscheduled breaks during each work shift.  Thus, there is substantial evidence in the record supporting the ALJ's conclusion that the claimant can perform work in the national economy.

Furthermore, the claimant was given an opportunity to pose her own hypothetical questions to the vocational expert.  The question her representative asked was whether a person taking heavy medication who is drowsy for forty percent of the day would be able to remain employed.  But there is no evidence in the record establishing that the claimant, if employed, would be drowsy for forty percent of the day.  No questions were asked by the claimant's representative regarding frequent unscheduled breaks or frequent absences for medical appointments.

The claimant also criticizes a specific job identified by the vocational expert at the hearing, suggesting that she does not, in reality, possess the skills necessary to do that job.  But the job identified by the vocational expert was described as an unskilled position.[91]  The Social Security regulations defined unskilled work, in pertinent part, as "work which needs little or no judgment to do simple duties that can

---

[91]      Rec. Doc. 7-1 at 62.

be learned on the job in a short period of time."[92]  By definition, the skills for such a job can be learned while the employee is working.  Accordingly, the claimant's pre-work skill set is immaterial to her suitability for an unskilled position.

In summary, the hypothetical questions posed by the ALJ at the hearing incorporated all of the impairments recognized by the ALJ.  The claimant had an opportunity to have her representative question the expert, but she did not pose hypotheticals incorporating the alleged impairments she now claims should have been included in the ALJ's hypotheticals.  Finally, there is no basis for concluding that the substantial rights of the claimant were abridged by the ALJ's framing hypothetical questions in the way they were articulated at the hearing.  Accordingly, this Court finds that the ALJ did not err by asking the hypothetical questions he posed to the vocational expert at the hearing.

## CONCLUSION AND RECOMMENDATION

The undersigned finds that the ALJ applied appropriate legal standards in ruling on this case and finds that the ALJ's findings are based on substantial evidence in the record.  Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **AFFIRMED** and this matter dismissed with prejudice.

---

[92]     20 C.F.R. § 404.1568.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 5th day of July 2016.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

-33-